## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| HUBERT PORTER, LOLITHA FARRAR and NAKIA WOODARD, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ARTHUR J. GALLAGHER (ILLINOIS), LLC, THE ARTHUR J. GALLAGHER CO. EMPLOYEES' 401(k) SAVINGS AND THRIFT PLAN BENEFITS COMMITTEE and JOHN DOES 1-10,<br><br>Defendants. | CIVIL ACTION NO.: |

## CLASS ACTION COMPLAINT

Plaintiffs, Hubert Porter, Lolitha Farrar, and Nakia Woodard ("Plaintiffs"), by and through their attorneys, on behalf of the Arthur J. Gallagher & Co. Employees' 401(k) Savings and Thrift Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

## I.   INTRODUCTION

1.      This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Arthur J. Gallagher, LLC ("Arthur J. Gallagher" or the "Company"), and the Arthur J. Gallagher & Co. Employees' 401(k) Savings and Thrift Plan Benefits Committee (the "Committee").

2.      The Plan is a defined contribution plan, established pursuant to 29 U.S.C. § 1002(2)(A) and § 1002(34) of ERISA, that enables eligible participants to make tax-deferred

---

[1] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

contributions from their salaries to the Plan. See Independent Auditor's Report ("Auditor's Report"), attached to Form 5500 for the Plan, at 6 ("The Plan is a defined contribution plan covering substantially all eligible employees of Gallagher and its participating subsidiaries. Employees are eligible to make contributions to the Plan after attaining the age of 21.").

3.    To safeguard plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).  These twin fiduciary duties are "the highest known to the law." *Halperin v. Richards*, 7 F.4th 534, 546 (7th Cir. 2021).

4.    The Department of Labor ("DOL") has also explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, "establish a prudent process for selecting investment options and service providers." [2] *See also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) ("*Tibble I*") (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

5.    Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options.  "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA"), § 7.

6.    "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but

---

[2] *See* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Sept. 2019), at 2, available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited September 25, 2025).

also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[3]

7.     Because cost-conscious management is fundamental to prudence in the investment function the concept applies not only to investments, but to a fiduciary's obligation to continuously monitor all fees incurred by plan participants, including a plan's recordkeeping and administration fees ("RKA").

8.     Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

9.     The Supreme Court reiterated that interpreting "ERISA's duty of prudence in light of the common law of trusts" a fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. *Hughes v. Nw. Univ.*, 595 U.S. 170, 175, 142 S. Ct. 737, 741, 211 L. Ed. 2d 558 (2022).

10.     Plaintiffs allege that during the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties it owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, failing to objectively and adequately review the Plan's investment portfolio, initially and on an

---

[3] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited September 25, 2025) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

ongoing basis, with due care to ensure that each investment option was prudent, in terms of performance.

11. At all times during the Class Period, the Plan had at least two billion dollars in assets under management. At the Plan's fiscal year end in 2019, the Plan had $2,326,004,332 in assets under management that were/are entrusted to the care of the Plan's fiduciaries. *See* 2019 Form 5500 for the Plan, Schedule H, at 2.

12. By 2023, the Plan had $3,238,355,508 in assets under management. *See* 2023 Form 5500 for the Plan, Schedule H, at 2.

13. The Plan is also large in terms of the number of its participants. At the beginning of the Class Period, the Plan had 18,607 participants. *See* 2019 Form 5500 for the Plan, at 2. By 2023, the Plan had 25,736 participants. *See* 2023 Form 5500 for the Plan, at 2.

14. With regard to the Plan's investments, Defendants breached their fiduciary duty of prudence by selecting and/or maintaining a certain guaranteed investment fund with lower crediting rates when compared to available similar or identical investments with higher crediting rates. The crediting rate is the guaranteed rate of return for the investment fund.

15. Specifically, Defendants allowed substantial assets in the Plan to be invested in the Massachusetts Mutual Life Insurance Company ("Mass Mutual") Guaranteed Interest Fund ("MassMutual GIF"), a guaranteed investment contract ("GIC"). The MassMutual GIF provided a significantly lower rate of return than other comparable stable value funds that Defendants could have made available to Plan participants, including MassMutual guaranteed investment contracts that were available in separate retirement plans.

16. MassMutual benefited significantly from Plan participants being invested in the MassMutual GIF. The assets invested in the MassMutual GIF were held and invested by MassMutual, which kept the spread (the difference between the amount MassMutual earned on the investments and the amount MassMutual paid to Plan participants). The crediting rates that

4

MassMutual provided to investors in the MassMutual GIF were/are so low that MassMutual reaped a windfall on the spread.

17. Plaintiffs allege that during the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost and performance.

18. Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and their participants millions of dollars.

19. Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count I), and failure to monitor fiduciaries (Count II).

## II.    JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, et seq.

21. This Court has personal jurisdiction over Defendants because the Plan is administered in this District, meaning Arthur J. Gallagher transacts business in this District, resides in this District, and/or has significant contacts with this District, and because ERISA provides for nationwide service of process.

22. Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C.

§ 1391 because Arthur J. Gallagher does business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

### III.   PARTIES

**Plaintiffs**

23.     Plaintiff, Hubert Porter ("Porter"), resides in Brooklyn, New York. During his employment, Plaintiff Porter participated in the Plan and invested in the options offered by the Plan that are challenged in this lawsuit. Plaintiff Porter specifically invested in the MassMutual GIF during the Class Period. He suffered injury to his Plan account from the underperformance of the funds in the Plan.

24.     Plaintiff, Lolitha Farrar ("Farrar"), resides in Pittsboro, North Carolina. During her employment, Plaintiff Farrar participated in the Plan and invested in the options offered by the Plan that are challenged in this lawsuit. Plaintiff Farrar specifically invested in the MassMutual GIF during the Class Period. She suffered injury to her Plan account from the underperformance of the funds in the Plan.

25.     Plaintiff, Nakia Woodard ("Woodard"), resides in Las Vegas, Nevada. During her employment, Plaintiff Woodard participated in the Plan and invested in the options offered by the Plan that are challenged in this lawsuit. Plaintiff Woodard specifically invested in the MassMutual GIF during the Class Period. She suffered injury to her Plan account from the underperformance of the funds in the Plan.

26.     Plaintiffs have standing to bring this action on behalf of the Plan because they participated and invested in the Plan and were injured by Defendants' unlawful conduct. Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duties as described herein.

27.     Plaintiffs did not have knowledge of all material facts necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

**Company Defendant**

28.     Arthur J. Gallagher, LLC is the plan sponsor for the Plan and a Plan administrator with a principal place of business at 2850 Golf Road, Rolling Meadows, Illinois. *See* 2023 Form 5500 for the Savings Plan, at 1-2.

29.     During the putative Class Period, the Company is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period, because it had control over Plan management and/or authority or control over management or disposition of Plan assets.

30.     According to the Plan, "[t]he members of the Committee shall be appointed by the Director of Employee Benefits of Arthur J. Gallagher & Co. (or, if there is no person holding that title, the person holding a successor title or acting in such capacity)." Eighteenth Amendment and Restatement of the Arthur J. Gallagher & Co. Employees' 401(k) Savings and Thrift Plan ("Plan. Doc."), at 61.

31.     Arthur J. Gallagher, through its Director of Employee Benefits, appointed the Committee to, among other things, ensure that the investments available to Plan participants are appropriate and performed well as compared to their peers. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

32.     Accordingly, Arthur J. Gallagher, during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committee.

33.     For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**Committee Defendants**

34.     As discussed above, Arthur J. Gallagher appointed the Arthur J. Gallagher & Co. Employees' 401(k) Savings and Thrift Plan Benefits Committee to, among other things, ensure that the investments available to Plan participants are appropriate and performed well as compared to their peers.

35.     "The Committee shall … designate, in its discretion, three or more Investment Funds, each of which shall be an available investment option ..." Plan Doc., at 22.

36.     Further, pursuant to Plan documents, "[t]he Committee may in its discretion increase or decrease the number of Investment Funds or change the Investment Funds." *Id*., at 23.

37.     The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

38.     The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Committee Defendants."

**IV.     CLASS ACTION ALLEGATIONS**[4]

---

[4] Although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plan because class certification is not necessarily required for Plaintiffs to prosecute claims on behalf of the Plan and all participants. *See, e.g.*, *In re: Wilmington Trust Corp.,* 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims). ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

39.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[5]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Arthur J. Gallagher & Co. Employees' 401(k) Savings and Thrift Plan, at any time between October 24, 2019 through the date of judgment (the "Class Period").

40.     The members of the Class are so numerous that joinder of all members is impractical. The 2023 Form 5500 for the Plan lists 25,736 Plan "participants with account balances as of the end of the plan year." 2023 Form 5500 for the Plan, at 2.

41.     Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

42.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

> A.     Whether Defendants are/were fiduciaries of the Plan;
>
> B.     Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

---

[5] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

      C.      Whether the Company failed to adequately monitor the Committee and other fiduciaries to ensure the Plan were being managed in compliance with ERISA;

      D.      The proper form of equitable and injunctive relief; and

      E.      The proper measure of monetary relief.

43.      Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

44.      This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

45.      In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V.     THE PLAN

46.     "The Plan is a defined contribution plan covering substantially all eligible employees of Gallagher and its participating subsidiaries." *See* Auditor's Report, attached to 2023 Form 5500 for the Plan, at 6.

47.     "The Plan provides participants with a long-term savings vehicle that can be used to accumulate income for retirement." IPS, at 1.

*The Plan's Investments*

48.     Per the IPS, the Committee is/was responsible for determining the appropriateness of the Plan's investment offerings and monitor investment performance histories as against the Morningstar index. *See* IPS, Appendix A (explaining that "Relative returns measure how well a fund has performed compared to investment options within the same Morningstar category. Relative returns are displayed as percentiles that range from 1 — 100. All else equal, lower percentile rankings are preferred to higher percentile rankings as lower percentile rankings imply outperformance. The thresholds for relative returns are: 1. Top 75% of the category over the last 3-year period. 2. Top 50% of the category over the last 5-yeat period."). As will be discussed in more detail below, the Committee fell well short of these fiduciary expectations.

49.     Included in the Plan's available funds was the Guaranteed Interest Fund offered by MassMutual[6] "which meets the fully benefit-responsive investment contract criteria and therefore are reported at contract value[.] … The Guaranteed Interest Fund held by the Plan is a guaranteed investment contract." *See* Auditor's Report, attached to 2022 Form 5500 for the Plan, at 16.

50.     At the end of 2019, $453,073,650 in Plan assets were invested in the MassMutual GIF. *See* Schedule H, Line 4i – Schedule of Assets (Held at End of Year), attached to 2019 Form 5500 for the Plan, at 17.

---

[6] Starting in 2022, the Plan's Form 5500s represented that Empower Annuity Insurance Company "is contractually obligated to repay the principal and a specified interest rate that is guaranteed to the Plan." Auditor's Report, attached to 2022 Form 5500 for the Plan, at 11.

51.     At the end of 2023, over $433 million in Plan assets were invested in the MassMutual GIF. *See* Schedule H, Line 4i – Schedule of Assets (Held at End of Year), attached to 2023 Form 5500 for the Plan, at 20.

52.     The chart below demonstrates the amount of Plan assets invested in the MassMutual GIF during the Class Period.

| Plan Year | Plan Assets in the MassMutual GIF |
|---|---|
| 2019 | $453,073,650 |
| 2020 | $523,560,360 |
| 2021 | $506,561,156 |
| 2022 | $517,986,370 |
| 2023 | $433,878,751 |

***Contributions***

53.     According to Plan documents, "There are generally eight types of contributions which may be made to the Plan: Before-Tax Contributions, Roth Contributions, Catch-up Contributions, Roth Catch-up Contributions, Matching Contributions (which can be Company Stock Matching Contributions or classified as Qualified Matching Contributions), discretionary Profit Sharing Contributions (which can be classified as Qualified Nonelective Contributions), Rollover Contributions and Roth Rollover Contributions." Prospectus and Summary Plan Description Arthur J. Gallagher & Co. Employees' 401(k) Savings and Thrift Plan ("SPD"), at 11

54.     Like other companies that sponsor 401(k) plans for their employees, Arthur J. Gallagher enjoys both direct and indirect benefits by providing matching contributions to Plan participants.  Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

55.     Arthur J. Gallagher also benefits in other ways from the Plan's matching program. It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new

12

employees and reduce turnover." *See,* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

56.     Given the size of the Plan, Arthur J. Gallagher likely enjoyed significant tax and cost savings from offering a match.

## VI.     THE TOTALITY OF THE CIRCUMSTANCES DEMONSTRATES THAT DEFENDANTS FAILED TO ADMINISTER THE PLAN IN A PRUDENT MANNER

### A.     ERISA Fiduciaries Are Held to the Highest Standards Regarding Process and Methodology of Evaluating Investments

57.     As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

58.     ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828; *see also Hughes*, 142 S. Ct. at 741.

59.     As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries. Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services. …" DOL 408(b)(2) Regulation Fact Sheet.

60.     The duty "…to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[7]

---

[7] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain.

61.     Acting in the sole interest of plan participants is all encompassing. A fiduciary must monitor all investment options in a 401(k) plan as a prudent investment professional. *See* the U.S. Department of Labor, Employee Benefits Security Administration (EBSA)'s "Meeting Your Fiduciary Responsibilities," at 2 ("The duty to act prudently is one of a fiduciary's central responsibilities under ERISA. It requires expertise in a variety of areas, such as investments."), available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

62.     A prudent investment professional, and hence a fiduciary, must regularly evaluate a fund's performance history, the portfolio manager's experience and tenure, changes to the fund's investment strategy, changes to the underlying assets in the investment, total assets under management within the fund, fees, and other relevant factors.

63.     With respect to investment returns, diligent investment professionals monitor the performance of their selected investments using appropriate industry-recognized "benchmarks" and prudently managed equivalents.

64.     The measurement of investments against prudently managed alternatives is critical given that these alternatives represent other investments available to a plan, which may increase the likelihood that participants reach/live their preferred lifestyle in retirement.

65.     Whether a plan fiduciary enlists the assistance of an investment manager, consultant, or advisor, the plan's fiduciaries are not relieved of fiduciary liability for selecting and monitoring the plan's investment options.

66.     It is black letter law that a fiduciary's duty to conduct an "independent investigation into the merits of a particular investment," is the "most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litigation*, 74 F.3d 420, 435 (3d Circ. 1996). *Hughes*, 142 S. Ct. at 738 (noting ERISA fiduciaries are required to "conduct their own independent evaluation to determine which investments may by prudently included in the plan's menu of options.").

67.    It may also indicate a lack of adequate care and attention to ignore sound advice provided by investment advisors.

68.    The Plan fiduciaries adopted an investment policy statement. As such, the fiduciaries "must comply with the plan's written statements of investment policy, insofar as those written statements are consistent with the provisions of ERISA." *Lauderdale v. NFP Retirement o, Inc.*, 2022 WL 17260510, at * 10 (S.D. Cal. Nov. 17, 2022). That is, the investment policy statement must be written with the sole interest of the plan participant in mind.

69.    Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing the Plan's investments and fees because this information is solely within the possession of Defendants prior to discovery. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

70.    In fact, in an attempt to discover the details of the Plan's mismanagement, Plaintiffs first wrote to the Plan administrator on March 13, 2025 to request, among other things, "all written instruments" governing or pertaining to the Plan, including "Investment Management Contracts, or other instruments under which the Plan was established or operated, and all amendments, exhibits, or appendices thereto," and as well as any committee's meeting minutes. This request was made pursuant to Section 104(b)(4) of ERISA. By letter dated April 11, 2025, Arthur J. Gallagher denied the Plaintiffs' request for meeting minutes.

71.    Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process. But in most cases even that is not sufficient. For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence.  Deliberative

15

processes can vary in quality or can be followed in bad faith. In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote et al. v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

72.     For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon several factors.

73.     Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in, *inter alia*, the selection (and maintenance) of the MassMutual GIF in the Plan throughout the Class Period that wasted the assets of the Plan and the assets of participants because of underperformance.

**B.      Defendants Breached Their Fiduciary Duties by Causing the Plan to Offer the MassMutual GIF**

74.     A stable value fund "can generally be labeled as a conservative, fixed income investment vehicle with an objective of preserving capital while providing a relatively stable rate of return that generally exceeds the returns provided by money market funds."[8]  In other words, the overarching goal of all stable value funds is to preserve capital.

75.     Stable value funds can be managed via guaranteed insurance contracts ("GICs"), "in which the fund manager holds or invests in a single group annuity contract issued directly to the retirement plan and the plan sponsor receives a direct guarantee of principal and accrued interest from the issuer."[9]

---

[8] ERISA Advisory Council Report on Stable Value Funds and Retirement Security in the Current Economic Conditions, https://www.dol.gov/agencies/ebsa/about-ebsa/about-us/erisa-advisory-council/2009-stable-value-funds-and-retirement-security-in-the-current-economic-conditions.

[9] *Id.*

76.    There are generally three types of GICs: a traditional GIC (sometimes called an insurance company general account), like the MassMutual GIF; a separate account GIC; and a synthetic GIC (sometimes called a security backed investment contract).

77.    "When evaluating a traditional GIC, the most important consideration for the fiduciary-along with the contract terms-is the insurer's financial strength rating since an insurer's general account backs the guarantee that is at the core of this product."[10]

78.    As indicated above, the Plan was invested in a proprietary guaranteed investment fund managed by MassMutual, then Empower, the MassMutual GIF.

79.    There are two significant problems with the MassMutual GIF discussed below. First, the MassMutual GIF is a traditional GIC and is structured as a general account, fixed annuity contract. As a general account product, the MassMutual GIF thus has the following characteristics: single-entity credit risk, plan-level illiquidity, lack of Plan participant ownership and investment control over assets, and lack of transparency as to fees.

80.    The second related problem with the MassMutual GIF is that its crediting rates (*i.e.*, rates of return on investment) were/are well below what Defendants could have obtained for the Plan participants on the open market.

81.    Defendants' selection of the imprudent MassMutual GIF was clearly a result of their lack of an investment review process, or at the very minimum, failure to implement a prudent investment review process.

### 1.    The Plan's Inclusion of the MassMutual GIF

82.    At all relevant times, Defendants maintained the authority to exercise control over the Plan's investments, including the Plan's MassMutual GIF.

---

[10] https://www.dol.gov/agencies/ebsa/about-ebsa/about-us/erisa-advisory-council/2009-stable-value-funds-and-retirement-security-in-the-current-economic-conditions.

83.    The Auditor's Reports attached to the 2023 Form 5500 for the Savings Plan and the

Retirement Plan state as follows

> **The Plan holds the Guaranteed Interest Fund which meets the fully benefit-responsive investment contract criteria** and therefore are reported at contract value. Contract value is the relevant measure for fully benefit-responsive investment contracts because this is the amount received by participants if they were to initiate permitted transactions under the terms of the Plan.
>
> The Guaranteed Interest Fund held by the Plan is a guaranteed investment contract. **The contract issuer is contractually obligated to repay the principal and interest at a specified interest rate that is guaranteed to the Plan.** The crediting rate is based on a formula established by the contract issuer but may not be less than 1% or more than 3%. **The crediting rate is reviewed on a semiannual basis for resetting. The contract cannot be terminated before the scheduled maturity date.**
>
> The Plan's ability to receive amounts due in accordance with fully benefit-responsive investment contracts is dependent on the third-party issuer's ability to meet its financial obligations. **The issuer's ability to meet its contractual obligations may be affected by future economic and regulatory developments. Certain events might limit the ability of the Plan to transact at contract value with the contract issuer.** These events may be different under each contract. Examples of such events include the following:
>
> 1. The Plan's failure to qualify under Section 401(a) of the Internal Revenue Code (the "Code") or the failure of the trust to be tax-exempt under Section 501(a) of the Code
> 2. Premature termination of the contracts
> 3. Plan termination or merger
> 4. Changes to the Plan's prohibition on competing investment options
> 5. Bankruptcy of the Plan Sponsor or other Plan Sponsor events (for example, divestitures or spinoffs of a subsidiary) that significantly affect the Plan's normal operations.
>
> […]
>
> **No events are probable of occurring that might limit the ability of the Plan to transact at contract value with the contract issuers and that also would limit the ability of the Plan to transact at contract value with the participants.**

Auditor's Reports attached to the 2023 Form 5500 for the Plan, at 16-17 (emphasis added).

84.     For these reasons, the MassMutual GIF's crediting rates can be compared to traditional GICs, commingled trust funds also called collective investment trusts, fixed annuity contracts, and other stable value funds or GICs whose terms are: (1) fully benefit-responsive, (2) do not permit the insurance companies to terminate the agreements before the end of the contract, (3) whose rates are reviewed regularly, and (4) whose contracts are with creditworthy insurance carriers. The MassMutual GIF's crediting rates can be also compared to GICs in plans whose managers do not believe that there are any events that are likely to limit the ability of the plan to transact at the contract value like the MassMutual GIF, therein making risk considerations equivalent. The Comparator GICs below meet these requirements.

85.     Defendants' selection of the imprudent MassMutual GIF was clearly a result of their lack of an investment review process, or at the very minimum, failure to implement a prudent investment review process.

### 2. There are Many GICs in the Marketplace with Competitive Crediting Rates, Including GICs Offered by MassMutual

86.      The Plan's fiduciaries should not have selected or maintained the MassMutual GIF.

87.     The marketplace for GICs is robust with many insurance companies offering GICs with competitive rates.

88.     Throughout the Class Period, identical or substantially identical stable value funds with higher crediting rates, and hence lower spreads, were available to the Plan, but were not selected by Defendants.

89.     These comparisons include:

- The Pomona Valley Hospital Medical Center Retirement Savings Plan's fully benefit-responsive synthetic GIC, where multiple "traditional investment contracts held by the Plan are guaranteed investment contracts" with multiple "contract issuers." *See* Auditor's Report, attached to the 2023 Form 5500 for the Pomona Valley Hospital Medical Center Retirement Savings Plan, at Note E. Like the MassMutual GIF, the crediting rates are review regularly (quarterly in the Pomona Valley Plan), and, like the MassMutual GIF, "the contracts cannot be terminated before the scheduled maturity date." *Id*. Also like the MassMutual GIF, "[n]o events

are probable of occurring that might limit the ability of the Plan to transact at contract value." *Id.*

- The Baylor College of Medicine Retirement Plan offered a "fully benefit-responsive investment contract" that is "fully and unconditionally guaranteed by Lincoln National Life Insurance Company." Like the MassMutual GIF, the "[t]he Plan Administrator believes that any events that would limit the Plan's ability to transact at contract value are remote." *See* Auditor's Report, attached to the 2020 Form 5500 for the Baylor College of Medicine Retirement Plan, at Note 5.

- The Gemba Group Annuity Plan offered a synthetic GIC with multiple underlying "guaranteed investment contracts[,]" and the GIC cannot be cancelled "before the scheduled maturity dates." Auditor's Report, attached to the 2021 Form 5500 for the Gemba Group Annuity Plan, at Note 4; *see also id.*, at Line 4i (listing the insurance companies). Also like the MassMutual GIF, "The Plan administrator believes that any events that would limit the Plan's ability to transact at contract value with participants are probable of not occurring." *Id.* Also like the MassMutual GIF, "The Plan administrator believes that any events that would limit the Plan's ability to transact at contract value with participants are probable of not occurring." *Id.*, at Note 5.

- The Holzer Health System 401(a) Profit Sharing Plan offered a Common collective trust, with multiple "underlying investments (consisting of guaranteed investment contracts, security-backed contracts and common collective trusts)." Auditor's Report, attached to the 2021 Form 5500 for the Holzer Health System 401(a) Profit Sharing Plan, at Note 3. "[T]he NAV of the fund is determined daily" and the "[u]nits are issued and redeemed" daily. *Id.* Hence, it was fully benefit-responsive. The assets are listed as assets of the plan. *Id.*, at Schedule H.

- The Jackson National Life Insurance Company Defined Contribution Plan offered a fully benefit-responsive investment contract that was a "Company-sponsored" annuity "exclusively designed for use in connection with the Plan" and is "backed by the creditworthiness of the Company." *See* Auditor's Report, attached to the 2022 Form 5500 for the Jackson National Life Insurance Company Defined Contribution Plan, at Note 3. The Company (Jackson National Life Insurance Company) is the plan sponsor. Also, the crediting rate is "based on current market rates[,]" not risk. *Id.*

- The Transamerica 401(k) Retirement Savings Plan offered a fully benefit-responsive GIC with Transamerica Financial Life Insurance Company ("TFLIC"), an affiliate of the plan sponsor, Transamerica Corporation. The GIC "consists of stable fund segments" with each segment have "a guaranteed rate of interest." Auditor's Report, attached to the 2019 Form 5500 for the Transamerica 401(k) Retirement Savings Plan, at page 9. Like the MassMutual GIF, the interest rate is determined regularly (quarterly in the Transamerica Plan). *Id.*, at 10. Also, like the MassMutual GIF, "[t]he Company does not believe that the occurrence of any such events that would limit the Plan's ability to transact at contract value with participants is probable." *Id.*, at 11. "TFLIC is not permitted to pay or transfer the

value of the contract, without consent from the Plan, prior to the scheduled maturity date." *Id*.

- The Valley Children's Hospital Defined Contribution Retirement Plan offered "a fully benefit-responsive investment contract with Lincoln National Life Insurance Company." Auditor's Report, attached to the 2023 Form 5500 for the Valley Children's Hospital Defined Contribution Retirement Plan, at Note 4. "The guarantee is based on Lincoln's ability to meet its financial obligations from the general assets of Lincoln." *Id*. "The Plan administrator does not believe that any events that would limit the Plan's ability to transact at contract value with participants are probable of occurring." *Id*.

- The HCC Insurance Holdings Inc. 401(k) Plan offered a fully benefit responsive guaranteed investment contract offered by MassMutual where the "interest rates are reviewed on a quarterly basis for resetting" and, like the MassMutual GIF, "[t]he Plan administrator does not believe that the occurrence of any such event, which would limit the Plan's ability to transact at contract value with participants, is probable." Auditor's Report, attached to the 2019 Form 5500 for the HCC Insurance Holdings Inc. 401(k) Plan, at Note 4. The assets of the HCC insurance GIC are Plan assets, albeit held by MassMutual. *Id*., at Schedule H.

- The American United Life Progress Sharing Plan and Trust offered a "fully benefit-responsive fixed interest investment option with the Company" that "is maintained in the Company's general account" where the rates are "determined quarterly." Auditor's Report, attached to the 2020 Form 5500 for the American United Life Progress Sharing Plan and Trust, at Note 2. The insurance carrier is/was also the plan sponsor. Also, like the MassMutual GIF, "[t]he Plan Administrator does not believe the occurrence of any such value event, which would limit the Plan's ability to transact at contract value with participants, is probable." *Id*.

- The Auto-Owners Insurance Company Retirement Savings Plan offered a "a fully benefit-responsive investment contract with Auto-Owners Life Insurance Company (AOLIC), a wholly owned subsidiary of Auto-Owners Insurance Company." Auditor's Report, attached to the 2023 Form 5500 for the Auto-Owners Insurance Company Retirement Savings Plan, at Note 3. Like the MassMutual GIF, "[t]he plan administrator does not believe" that any events that "would limit the Plan's ability to transact at contract value" "is probable", and "The guaranteed investment contract does not permit the insurance company to terminate the agreement prior to the scheduled maturity date." *Id*.

- The International Imaging Materials Inc. Retirement and Investment Plan offered a "traditional fully benefit-responsive investment contract[.]" Auditor's Report, attached to the 2022 Form 5500 for the International Imaging Materials Inc. Retirement and Investment Plan, at Note 2. The crediting rates are determined "quarterly" and, like the MassMutual GIF, "there are no events that limit the ability of the Plan to transact at contract value with the issuers." *Id*. Although "Lincoln Insurance maintain[s] the contributions in a general account fund" it is listed as plan assets. *Id*., at Note 2 and Schedule H. Rates are based on "factors, including economic and market conditions, the general interest rate environment and the

21

expected and actual return on the portfolio within the general account[,]" not risk. *Id*. What Lincoln deemed reflective of the "economic and market conditions" should be the same for the MassMutual GIF during the same "economic and market conditions."

- The Mattel, Inc. Personal Investment Plan offered a fully benefit-responsive "traditional GIC" where "the contract itself is owned by the Plan." Auditor's Report, attached to the 2023 Form 5500 for the Mattel, Inc. Personal Investment Plan, at Note 3. "The Plan's administrator does not believe that the occurrence of any such event, which would limit the Plan's ability to transact at contract value with participants, is probable" and "Mattel is unaware of any events which occurred during 2023 that would allow contract issuers to terminate the contracts held by the Plan." *Id.*

- The Trugreen Profit Sharing and Retirement Plan offered a "a traditional fully benefit-responsive guaranteed investment contract" offered by MassMutual. Auditor's Report, attached to the 2021 Form 5500 for the Trugreen Profit Sharing and Retirement Plan, at Note 4. "The crediting rate is reviewed on a quarterly or semiannual basis for resetting. The guaranteed investment contract does not permit the insurance company to terminate the agreement prior to the scheduled maturity date." *Id*. "No events are probable of occurring that might limit the ability of the Plan to transact at contract value." *Id*. Although "MassMutual maintains the contributions in a general account[,]" *id*., the assets are listed as plan assets. *Id*., at Note 4, Schedule H.

90.     The MassMutual GIF in the Plan is a general account product that should have had a high crediting rate given its riskiness, yet it had underwhelming crediting rates when compared against GICs with similar or lower riskiness provided by other comparable carriers for other retirement plans:

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate[11] |
|---|---|---|---|---|---|
| 2019 | Baylor College of Medicine Retirement Plan | 12,587 | $1,278,730,175 | Lincoln National Life Insurance Co. | 4.29% |
| | Jackson National Life Insurance Company Defined Contribution Plan | 5,002 | $1,090,110,381 | Jackson National Life Insurance | 4.28% |

---

[11] For crediting rates not identified in the plans' Form 5500s, the calculated yield is interest credited divided by the end of year balance.

| | | | | |
|---|---|---|---|---|
| | Holzer Health System 401(a) Profit Sharing Plan | 1,896 | $179,609,420 | American United Life Insurance Company | 3.98% |
| | Transamerica 401(k) Retirement Savings Plan | 15,140 | $2,020,965,905 | Transamerica Financial Life Insurance Company | 3.85% |
| | American United Life Progress Sharing Plan and Trust | 3,051 | $377,919,056 | American United Life Insurance Company | 3.70% |
| | HCC Insurance Holdings Inc. 401(k) Plan | 2,515 | $355,957,124 | Massachusetts Mutual Life Insurance Company | 3.56% |
| | **Arthur J. Gallagher Plan** | **18,607** | **$2,326,004,332** | **MassMutual** | **3.2%** |
| 2020 | Baylor College of Medicine Retirement Plan | 12,905 | $1,493,377,139 | Lincoln National Life Insurance Co. | 4.16% |
| | HCC Insurance Holdings Inc. 401(k) Plan | 2,711 | $428,308,461 | Massachusetts Mutual Life Insurance Company | 3.56% |
| | American United Life Progress Sharing Plan and Trust | 2,699 | $435,970,029 | American United Life Insurance Company | 3.54% |
| | **Arthur J. Gallagher Plan** | **18,870** | **$2,714,481,993** | **MassMutual GIF** | **3.00%** |
| 2021 | Gemba Group Annuity Plan | 969 | $118,565,852 | National Ohio Financial Services | 4.97% |
| | Baylor College of Medicine Retirement Plan | 13,391 | $1,692,013,731 | Lincoln National Life Insurance Co. | 4.23% |
| | Holzer Health System 401(a) Profit Sharing Plan | 2,017 | $203,815,263 | American United Life Insurance Company | 4.02% |

| | | | | | |
|---|---|---|---|---|---|
| | American United Life Progress Sharing Plan and Trust | 3,183 | $493,267,284 | American United Life Insurance Company | 3.87% |
| | Gemba Group Annuity Plan | 969 | $118,565,852 | Principal Life Insurance Company | 3.84% |
| | **Arthur J. Gallagher Plan** | **19,809** | **$3,129,693,188** | **MassMutual GIF** | **1.81%** |
| 2022 | International Imaging Materials Inc. Retirement and Investment Plan | 445 | $59,443,888 | Lincoln National Life Insurance Co. | 4.89% |
| | Baylor College of Medicine Retirement Plan | 14,036 | $1,434,738,254 | Lincoln National Life Insurance Co. | 4.37% |
| | American United Life Progress Sharing Plan and Trust | 3,235 | $439,262,320 | American United Life Insurance Company | 3.90% |
| | Jackson National Life Insurance Company Defined Contribution Plan | 4,650 | $1,149,061,601 | Jackson National Life Insurance | 3.83% |
| | Trugreen Profit Sharing and Retirement Plan | 11,408 | $371,495,784 | Massachusetts Mutual Life Insurance Company | 3.67% |
| | **Arthur J. Gallagher Plan** | **21,450** | **$2,780,042,149** | **MassMutual GIF** | **3.00%** |
| 2023 | The Valley Children's Hospital Defined Contribution Retirement Plan | 4,282 | $550,230,744 | Lincoln National Life Insurance Co. | 4.57% |
| | Mattel, Inc. Personal Investment Plan | 7,427 | $1,167,576,000 | Metropolitan Tower Life Insurance Co. | 3.71% |

| | Pomona Valley Hospital Medical Center Retirement Savings Plan | 4,219 | $525,201,271 | Lincoln National Life Insurance Co. | 3.64% |
|---|---|---|---|---|---|
| | Auto-Owners Insurance Company Retirement Savings Plan | 8,582 | $772,874,102 | Auto-Owners Life Insurance Company | 3.48% |
| | **Arthur J. Gallagher Plan** | **25,736** | **$3,238,355,508** | **MassMutual GIF** | **3.00%** |

91.    Throughout the Class Period, the MassMutual GIF in the Savings Plan and the Retirement Plan underperformed the comparator funds by between 19% and 28%, as demonstrated in the tables below.

| Year | MassMutual GIF Rate of Return in the Plan | Comparator Average Rate of Return | MassMutual GIF Percentage of Underperformance in the Plan |
|---|---|---|---|
| 2019 | 3.20% | 3.94% | 18.78% |
| 2020 | 3.00% | 3.75% | 20.00% |
| 2021 | 3.00% | 4.19% | 28.40% |
| 2022 | 3.00% | 4.13% | 27.36% |
| 2023 | 3.00% | 3.85% | 22.08% |
| Average Underperformance during Class Period | | | 23.32% |

92.    The dramatic disparities between crediting rates in all years demonstrate that any purported difference in GIC type or theoretical risk cannot be the reason for the MassMutual GIF's dismal crediting rate.

93.    Again, specific Comparator GICs used herein all had similar risk considerations based on their terms, the creditworthiness of their insurance carriers, and the fact that their plan administrators did not believe it probable that any plan or sponsor event would limit the ability of the Plan to transact at contract value. The Comparator GICs were all fully benefit-responsive and

their crediting rates were all regularly reviewed in the same prevailing marketplace and economic circumstances as the MassMutual GIF.

94.     In short, because the Plan held between $2.3 billion and $3.2 billion in assets under management throughout the Class Period, it had considerable leverage to bargain for higher crediting rates.

95.     A prudent fiduciary would have known that other providers of GICs offer substantially identical, better-performing stable value investments. A prudent fiduciary could have accomplished this goal by demanding higher crediting rates from the Insurance Companies and/or by submitting requests for proposals to the Insurance Companies and other providers of stable value investments.

96.     By selecting the MassMutual GIF with underperforming crediting rates, Defendants failed to provide participants with an option that maximized the value of their investments without needing to take on more risk.

97.     With the significant amount of assets under management in the MassMutual GIF, the losses suffered by Plan participants were devastating. Every additional expense imposed upon the participants compounds and reduces the value of their retirement savings over time. *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015). For example, a 1% higher fee over 35 years makes a 28% difference in retirement assets at the end of a participant's career.[12]

**COUNT I**
**Breaches of Fiduciary Duty of Prudence**
**(against the Committee)**

98.     Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

---

[12] Look at 401(k) Plan Fees, UNITED STATES DEPT. OF LABOR at 2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource center/publications/401k-plan-fees.pdf (accessed Feb. 14, 2025).

99.     At all relevant times, the Committee and its members ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

100.     As fiduciaries of the Plan, the Prudence Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

101.     The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. Prudence Defendants did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the interest of Plan's participants. Instead, the Prudence Defendants selected and retained investment options in the Plan despite poor performance in relation to other comparable investments.

102.     As a direct and proximate result of the breaches of fiduciary duties alleged herein related to the MassMutual GIF, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had Prudence Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

103.     Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

104.    The Prudence Defendants knowingly participated in each breach, knowing that such acts were a breach, and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.

### COUNT II
### Failure to Adequately Monitor Other Fiduciaries
### (against the Company)

105.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

106.    Arthur J. Gallagher, LLC (the "Monitoring Defendant") had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and was aware that the Committee had critical responsibilities as fiduciaries of the Plan.

107.    In light of this authority, the Monitoring Defendant had a duty to monitor the Committee to ensure that the Committee was adequately performing its fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee was not fulfilling those duties.

108.    The Monitoring Defendant also had a duty to ensure that the members of the Committee possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Company.

109.    The Monitoring Defendant breached its fiduciary monitoring duties by, among other things, failing to monitor and evaluate the performance of the Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee's imprudent actions and omissions.

110.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars in losses. Had the Monitoring Defendant complied with its fiduciary

obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

111.     Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendant is liable to restore to the Plan all losses caused by its failure to adequately monitor the Committee. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.     A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.     Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.     A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.     An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.     An order requiring the Company Defendant to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a

constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

I.      An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.      Such other and further relief as the Court deems equitable and just.

Dated: October 24, 2025                Respectfully submitted,

                                       */s/ Mark K Gyandoh*
                                       Mark K. Gyandoh, Esquire
                                       James A. Maro, Esquire
                                       **CAPOZZI ADLER, P.C.**
                                       312 Old Lancaster Road
                                       Merion Station, PA 19066
                                       Email: markg@capozziadler.com
                                              jamesm@capozziadler.com
                                       Tel.: (610) 890-0200
                                       Fax: (717) 232-3080

                                       *Counsel for Plaintiffs and the Putative Class*